## COLLATERAL/REIMBURSEMENT AGREEMENT

This COLLATERAL AND REIMBURSEMENT AGREEMENT ("AGREEMENT") is made this ___20TH___ day of _December_ , 2007, by and between the PRINCIPAL, the INDEMNITORS and the SURETY all as defined in this AGREEMENT.

### RECITALS

1.    The PRINCIPAL is engaged in the business of construction. From time to time the PRINCIPAL was required to deliver certain BONDS to certain OBLIGEES.

2.    The INDEMNITORS executed a General Indemnity Agreement ("INDEMNITY AGREEMENT") in favor of the SURETY dated June 18, 2004.

3.    In partial consideration for the promises made by the INDEMNITORS in the INDEMNITY AGREEMENT, the SURETY issued certain BONDS on behalf of the PRINCIPAL. A list of the BONDS is attached as Exhibit A and incorporated into this AGREEMENT.

4.    Claims have been made against the BONDS issued by the SURETY.

5.    The INDEMNITORS acknowledge that they are presently in default of the INDEMNITY AGREEMENT.

6.    The SURETY and the INDEMNITORS entered into a TRUST AGREEMENT of even date.

7.    A further purpose of this AGREEMENT is to document the arrangements and relationships governing the current and future conduct of business between the PRINCIPAL, the INDEMNITORS and the SURETY and to carry out certain provisions of the SURETY AGREEMENTS.

### SECTION 1 - INCORPORATION

The above Recitals are contractual and incorporated into these Covenants.

### SECTION 2 - DEFINITIONS

The following terms in this AGREEMENT are defined as follows:

ACCOUNTS shall mean all of the INDEMNITORS' now owned or subsequently acquired accounts, accounts receivable, fees generated from their WORK, proceeds, all obligations owing to the INDEMNITORS under instruments and documents of title and all rights, securities, and guarantees with respect to each account.

ADVANCES shall mean any sums advanced, incurred or sustained by the SURETY in connection with any of the SURETY AGREEMENTS or in connection with any BONDS, with any ADVANCES subject to the reimbursement provisions of this AGREEMENT.

AFFILIATE means, with respect to any PERSON, any other PERSON or group acting in concert with such PERSON that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under the common control of such PERSON. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any PERSON or group of PERSONS, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such PERSON, whether through the ownership of voting securities or by contract or otherwise.

AGREEMENT means this COLLATERAL/REIMBURSEMENT AGREEMENT together with all incorporated amendments, modifications, supplements and Exhibits.

BANKRUPTCY CODE means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

BOND OR BONDS means any and all bonds, undertakings, guarantees, contractual obligations, and writings or statements of prequalification or commitment, including Modifications thereof, which the SURETY has executed or procured for or on behalf of: (a) any one or more of the INDEMNITORS (without regard to whether any such INDEMNITOR signed this AGREEMENT), their respective present or future direct or indirect parent companies, affiliates and all of their respective successors and assigns; (b) any present or future affiliates; (c) any other person or entity at the request of any of the INDEMNITORS; or (d) any combination of (a) through (c) above, whether executed or procured before, on, or after the execution of this AGREEMENT, including any bond the SURETY has an obligation for as a result of an asset purchase, acquisition, merger or like transaction. For the purpose of this definition, "Modifications" shall include but not be limited to renewals, substitutions, riders, endorsements, reinstatements, replacements, increases or decreases in penal sum, continuations, and extensions.

BONDED CONTRACTS means any contract referred to or described in any BONDS.

CONTRACT FUNDS means payments made or to be made to the PRINCIPAL, or on behalf of the PRINICPAL, pursuant to, or arising out of, or related to, any of the BONDED CONTRACTS including, without limitation, progress payments, whether earned and unpaid or to be earned, the retainages (including certificates of deposit or similar instruments of any nature whether posted in lieu thereof or otherwise or escrow accounts), change orders, modifications, claims for additions, and/or increases in contract amounts of any description, and all backcharges and damages for delay and/or breach.

COPYRIGHTS means all of each of the INDEMNITORS' present or subsequently acquired copyrights, copyright registrations, recordings, applications, designs, styles, licenses, marks, prints, labels and all present and future rights, titles, proceeds and interests in and to each of the foregoing.

COST TO COMPLETE means the anticipated and/or unpaid cost of materials, labor, and other items, including, but not limited to, backcharges, OVERHEAD and penalties for termination or late completion required to complete the WORK required by any BONDED CONTRACTS or UNBONDED CONTRACTS, as applicable.

EQUIPMENT means all of each INDEMNITORS' present and subsequently acquired equipment together with all installed and/or affixed attachments, components, parts, accessories and proceeds.

EVENT OF DEFAULT means any one or more of the following:

(a)    If the INDEMNITORS, or any of them, within three (3) calendar days after receipt of written notice by the SURETY to the INDEMNITORS have failed or refused to perform any obligation under this AGREEMENT or any other of the SURETY AGREEMENTS, as determined by the SURETY; or

(b)    The occurrence of any "EVENT OF DEFAULT" or Default under any of the SURETY AGREEMENTS; or

(c)    Any representation or warranty made or deemed made by the INDEMNITORS in this AGREEMENT or the other SURETY AGREEMENTS, or which is contained in any certificate, document, opinion or financial or other statement furnished under or in connection with any of the SURETY AGREEMENTS, which shall prove to have been incorrect including, but not limited to, the FINANCIAL STATEMENTS, attached hereto as Exhibit I if they are MATERIALLY DIFFERENT on or as of the date made or deemed made; or

(d)    An OBLIGEE has declared any INDEMNITOR to be in default under a BONDED CONTRACT and the INDEMNITORS have failed to cure such default within the period of time provided to cure that default in the BONDED CONTRACT.  The INDEMNITORS' assertions that they are not in default under the BONDED CONTRACT shall not be a defense to the SURETY'S enforcement of this AGREEMENT; or

(e)    The INDEMNITORS failure to timely pay when due any obligation or indebtedness due under the SURETY AGREEMENTS; or

(f)    The filing of a petition under any applicable provisions of the BANKRUPTCY CODE by or against one or more of the INDEMNITORS, the making by any one or more of the INDEMNITORS of any assignment for the benefit of creditors, or if any one or more of the INDEMNITORS becomes insolvent or generally unable to satisfy debts as they become due, the filing of a tax lien against one or more of the INDEMNITORS, the filing of a petition for the appointment of a receiver or trustee with respect to an INDEMNITOR or the commencement of any proceeding by or against one or more of the INDEMNITORS under any reorganization, arrangement, readjustment of debts, dissolution, liquidation or assignment for the benefit of creditors by statute or law of any jurisdiction; or

(g)    The failure of any INDEMNITOR, at the request of the SURETY, to furnish financial information, permit inspection or copying of books and records or to cooperate or deal

in good faith with the SURETY.

Notwithstanding the foregoing, the occurrence of any of the events described in the foregoing items (a) through (e) will not be deemed an EVENT OF DEFAULT hereunder if such failure or event is curable and the INDEMNITORS effect such cure within three (3) calendar days of the SURETY' notice to cure; provided, however, all cure periods permitted under this AGREEMENT and under any of the other SURETY AGREEMENTS will run contemporaneously.

FINANCIAL STATEMENTS means balance sheets, income statements and other financial data.

GAAP means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board, the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board.

GENERAL INTANGIBLES means all of each INDEMNITORS' present and subsequently acquired general intangibles including all present and future rights, titles and interests in and to all: COPYRIGHTS; PATENTS; TRADEMARKS; licenses, permits and franchises; proprietary software; any other forms of similar intellectual property; all customer lists, distribution agreements, supply agreements; and all blueprints, other drawings and schematics related to all BONDED and UNBONDED CONTRACTS.

INDEMNITORS means the PRINCIPAL and Frazier Development LLC, M.F. Properties, LP, AWF, LLC, C.E Frazier, Jr. individually, ~~Phyllis E Frazier individually~~, Austin W. Frazier individually, and Claiborne Frazier individually.

INDEMNITY AGREEMENT means collectively the General Agreement of Indemnity dated June 18, 2004, and any all predecessor agreements, and all modification, amendments, Riders, or supplements thereto, and any agreements relating thereto or referenced therein.

INVENTORY means all of each INDEMNITORS' present and subsequently acquired inventory wherever located together with all goods and materials used or usable in manufacturing, processing, packaging or shipping same in all stages of production from raw materials to finished goods and all proceeds from such INVENTORY.

INVESTMENT PROPERTY means all of each INDEMNITORS' present and subsequently acquired securities, security entitlements, securities accounts, commodities contracts and commodities accounts together with all proceeds from each.

LIEN means any mortgage security interest, lien, pledge, charge, proxy, voting trust or arrangement, encumbrance, lease, sublease, license, or other right of use by another or other interest of any character whatsoever.

LOCK-BOX or LOCK-BOX ACCOUNT means the arrangement or account established by the SURETY in the SURETY'S name at the BANK into which the INDEMNITORS will direct the OBLIGEES to remit the CONTRACT FUNDS.

LOSS means:

(a)  All damages, costs, attorney fees and liabilities, including all related and incurred expenses that the SURETY may sustain or incur by reason of issuing BONDS, which already or hereafter may be executed or procured on behalf of the INDEMNITORS, or any renewal or continuation thereof; or which may be sustained or incurred by reason of making any investigation on account thereof, prosecuting or defending any action in connection therewith, obtaining a release, recovering or attempting to recover any salvage in connection therewith or enforcing by litigation or otherwise any of the provisions of this AGREEMENT, or the other SURETY AGREEMENTS, including, but not limited to:

(1)  money judgments, amounts paid in settlement or compromise, the full amount of reasonable attorney and other professional fees incurred or paid by the SURETY, court costs and fees, with interest at the maximum legal rate allowable on all sums due the SURETY from the date of the SURETY'S demand for such sums, whether or not interest has been awarded by a court; and

(2)  any loss which the SURETY may sustain or incur in connection with the BONDED CONTRACTS or BONDS, whether that loss results from the activity of the INDEMNITORS solely or as part of a joint venture, partnership or other entity which has been or may be formed with the INDEMNITORS; and

(3)  any loss which the SURETY may sustain or incur as a result of any actions taken by the SURETY upon information provided by the INDEMNITORS; and

(4)  any ADVANCES or loans made by the SURETY, if any; and

(5)  any amounts that have been paid to the SURETY that a court of competent jurisdiction determines constitute "preferences," within the meaning of §547 of the BANKRUPTCY CODE, and by reason thereof the SURETY is required to disgorge any such amounts paid.

(b)  legal, accounting, and consulting fees and related expenses, including but not limited to, legal fees incurred in the enforcement of the SURETY AGREEMENTS.

(c)  all premiums, fees, interest and other charges due the SURETY in connection with the SURETY AGREEMENTS or the BONDS.

MATERIALLY DIFFERENT means that the dollar value of the assets or liabilities of each or any of the INDEMNITORS vary in amount by ten (10) percent or more from the value as represented in the FINANCIAL STATEMENTS attached as Exhibit B and incorporated into this AGREEMENT as of the date on the FINANCIAL STATEMENTS in Exhibit B.

OBLIGEE shall mean any named party or parties appearing on the BONDS in whose favor the BONDS are issued.

OTHER COLLATERAL means all of each INDEMNITORS' now or subsequently owned or acquired accounts, blocked accounts, deposit accounts, INVESTMENT PROPERTY, cash, books, records, ledger cards, disks and related data processing software and all proceeds related to each.

OVERHEAD means the general operating and administrative expenses of the PRINCIPAL, including, but not limited to, the cost of rent, utilities, taxes, and all other expenses of the PRINCIPAL not allocated to a specific BONDED CONTRACT.

PATENTS means each of the INDEMNITORS' present and subsequently acquired patents, patent applications, registrations, reissues, renewals, licenses, inventions, improvements and all present and future rights, titles, proceeds and interests in and to each.

PAYROLL ACCOUNT means the account established in the PRINCIPAL'S name to process payroll for the BONDED CONTRACTS.

PERSON means any entity, whether an individual, trustee, corporation, partner, joint stock company, unincorporated organization, business association or firm, joint venture, a government or any agent or instrumentality or political subdivision thereof.

PRINCIPAL means C.E. Frazier Construction Company, Inc.

PROGRESS PAYMENTS means those funds, net of RETENTIONS, which would otherwise be immediately due the PRINCIPAL in the absence of a default under the BONDED CONTRACT with respect to which periodic payments for completed WORK are owed.

REMAINING CONTRACT BALANCES means CONTRACT FUNDS less the PROGRESS PAYMENTS made to the PRINCIPAL but excluding there from any and all claims for additional compensation, or other remuneration, of the PRINCIPAL under any BONDED CONTRACT, that will not be collected within ninety (90) days of the date of determination of the REMAINING CONTRACT BALANCES.

RESERVE means a sum of money that must be set aside by the SURETY to pay present and future liabilities under the BONDS.

RETENTIONS means a specified percentage of contract proceeds periodically withheld by an OBLIGEE to provide further security for the PRINCIPAL'S performance of any BONDED CONTRACT, and as such are payable to the PRINCIPAL only upon a clear demonstration of compliance with the terms of the BONDED CONTRACT.

SURETY AGREEMENTS means collectively, the INDEMNITY AGREEMENT, this AGREEMENT, and the TRUST AGREEMENT.

SURETY means Travelers Casualty and Surety Company of America, St. Paul Fire and Marine Company and any of their present or future direct or indirect parent companies, any of the respective or future direct or indirect affiliates or subsidiaries of such companies and parent

companies, and/or their successors, assigns, parent companies and subsidiaries, whether in existence now or formed hereafter, including any predecessors in interest.

TAX OR TAXES means any present or future tax, levy, impost, duty, charge, fee, deduction or withholding of any nature and whatever called by whomever on whomever and wherever imposed, levied, collected, withheld or assessed.

TRADEMARKS means each INDEMNITORS' present and subsequently acquired trademarks, trademark registrations, recordings, applications, trade names, trade styles, service marks, prints, labels, licenses, reissues, renewals and all present and future rights, titles, proceeds and interests in and to each.

TRUST ACCOUNT means the account established in the SURETY'S name which will be used to disburse payments as provided in the TRUST AGREEMENT.

TRUST AGREEMENT means an agreement of even date with this AGREEMENT which is between the INDEMNITORS and the SURETY, and governs the collection and disbursement of the CONTRACT FUNDS and the disbursement of the proceeds.

UCC means the Uniform Commercial Code in effect in the State of Mississippi as amended. If by law the perfection of a security interest in any item(s) of Collateral is governed by any state other than Mississippi, "UCC" means the Uniform Commercial Code in effect in such state related to those item(s).

UNBONDED CONTRACTS means all of the PRINCIPAL'S contracts for the WORK performed by the PRINCIPAL (including, but not limited to, associated subcontracts and contracts for the purchase of supplies), but excluding the BONDED CONTRACTS.

WORK means the general construction and construction management services required by any BONDED CONTRACT or UNBONDED CONTRACT of the PRINCIPAL, whether completed or partially completed, and includes all other labor, materials, equipment, and services provided or to be provided by the PRINCIPAL to fulfill any of the PRINCIPAL'S obligations.

Any collectively defined term and any defined term used in the plural shall be taken to encompass all members of the relevant class. Any defined term used in the singular preceded by "any" shall be taken to indicate any number or any one of the members of the relevant class, individually. The words "hereof" and "herein", and words of similar import when used in this AGREEMENT shall refer to this AGREEMENT as a whole and not to any particular provision of this AGREEMENT.

## SECTION 3 – ACKNOWLEDGEMENT

3.1    The INDEMNITORS acknowledge and affirms that the delivery of this AGREEMENT is unconditional and that each of them agrees to perform unconditionally each of their obligations under this AGREEMENT. The INDEMNITORS specifically affirm they have not been induced to execute this AGREEMENT or any other related agreements by any representations, agreements or understandings not expressly contained herein and in particular,

but not by way of limitation, to those hereinafter enumerated: they affirm that no understanding, agreement or representation which is inconsistent or in conflict with the terms of this AGREEMENT has been made by or on behalf of the SURETY with respect to: the payment provisions provided for in this AGREEMENT or in any other document executed and delivered by any of them, with respect to grace periods, renewals or extensions for payment; or the making of further accommodations for the benefit of any of them or any other party; the modifications or alteration of any of the terms of this AGREEMENT; or the enforceability of any terms and provisions in this AGREEMENT.

3.2    The INDEMNITORS further acknowledge that each of them furnished the SURETY with FINANCIAL STATEMENTS and financial data to induce the SURETY to enter into this AGREEMENT. Copies of the FINANCIAL STATEMENTS and financial data provided are incorporated into and made part of this AGREEMENT and are attached as Exhibit B. Each INDEMNITOR certifies that Exhibit B, as it pertains to such INDEMNITOR, is a complete and accurate representation of such INDEMNITOR'S respective financial circumstances. As such, each INDEMNITOR declares under penalty of perjury under the laws of the State of Mississippi that Exhibit B is true and correct as to such INDEMNITOR as of the dates noted on those documents. *1622 B Rosemout Dr. - Clinton MS was listed on Financial statements by mistake. This was given to Phyllis Frazier by her father in 1995.*

*D.F.*
*M.F.*
*CF*
*CF*

### SECTION 4 – RATIFICATION

The INDEMNITORS hereby acknowledge the INDEMNITORS' execution of the INDEMNITY AGREEMENTS and ratify and reaffirm each of those agreements and the INDEMNITORS' joint several liability thereunder to exonerate, indemnify, and keep indemnified, the SURETY from and against any and all liability for LOSS, as a result of PRINCIPAL'S failure to perform or comply with any of the terms of the INDEMNITY AGREEMENTS or any other SURETY AGREEMENTS.

### SECTION 5 – SURETY ADVANCES, FINANCIAL ASSISTANCE, BONDS

At the SURETY'S sole and absolute discretion, the SURETY may make ADVANCES to the INDEMNITORS or on behalf of the INDEMNITORS as provided herein and by the terms of the TRUST AGREEMENT.

The INDEMNITORS acknowledge that the INDEMNITORS and the SURETY have entered into this Agreement and the TRUST AGREEMENT to provide financial assistance and accommodation to the INDEMNITORS. Without this financial assistance and accommodation the INDEMNITORS acknowledge that the INDEMNITORS would be unable to pay for labor and materials and complete performance under the BONDED CONTRACTS, as the cash flow of the INDEMNITORS has been critical to the point that there are not adequate funds to pay these obligations and complete the BONDED CONTRACTS.

**THE INDEMNITORS ALSO ACKNOWLEDGE AND UNDERSTAND THAT ANY DECISION WITH RESPECT TO BONDS SHALL BE MADE BY THE SURETY EXECUTIVES IN ITS HOME OFFICE AND THAT NO EMPLOYEE OR REPRESENTATIVE OF THE SURETY HAS THE AUTHORITY TO MAKE SUCH A DECISION. THE EXECUTION OF THIS AGREEMENT AND THE TRUST**

**AGREEMENT, ESTABLISHMENT OF THE LOCK-BOX ACCOUNT, THE TRUST ACCOUNT AND PAYROLL ACCOUNT IN NO MANNER BINDS THE SURETY TO EXECUTE ANY FUTURE BONDS ON BEHALF OF THE INDEMNITORS. THE INDEMNITORS SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THEIR EXECUTION OF THIS AGREEMENT, AND THE TRUST AGREEMENT, (AND THE ESTABLISHMENT OF THE LOCK-BOX ACCOUNT, THE TRUST ACCOUNT AND PAYROLL ACCOUNT) HAVE NOT BEEN INDUCED BY RELIANCE UPON ANY ORAL OR WRITTEN REPRESENTATIONS BY THE SURETY OR ITS AGENTS, EMPLOYEES, ATTORNEYS OR CONSULTANTS THAT THE SURETY WILL EXECUTE ANY FUTURE BONDS ON BEHALF OF THE INDEMNITORS. IN THE EVENT THE SURETY EXECUTES ANY FUTURE BONDS ON BEHALF OF THE INDEMNITORS, ANY SUCH BONDS THAT ARE EXECUTED SHALL BE IN THE SOLE JUDGMENT, OPTION AND DISCRETION OF THE SURETY. IF THE SURETY DOES EXECUTE ANY BONDS BEFORE OR AFTER THE EXECUTION OF THIS AGREEMENT, THEN THE SURETY'S EXECUTION OF ANY SUCH BOND DOES NOT BIND OR COMMIT THE SURETY TO EXECUTE ANY OTHER BONDS, INCLUDING ANY FINAL BONDS AFTER A BID BOND HAS BEEN EXECUTED. IF THE SURETY EXECUTES ANY FUTURE BONDS ON BEHALF OF THE INDEMNITORS, ANY SUCH BOND SHALL BE SUBJECT TO THE TERMS AND PROVISIONS OF THIS AGREEMENT AND THE OTHER SURETY AGREEMENTS.**

## SECTION 6 – WITHDRAWAL OF FINANCIAL ASSISTANCE

At its sole option and absolute discretion, the SURETY has the right to withdraw any of its financial assistance or accommodation to the INDEMNITORS, stop making ADVANCES, if any, or decline to counter-sign any checks or make any transfers. The INDEMNITORS hereby expressly waive, release and forever relinquish any cause of action or defense existing now, or in the future, whether sounding in tort or contract, (or any other legal theory,) arising from, connected to, or in any way relating to the SURETY withdrawing any financial assistance or accommodation, or no longer making ADVANCES, if any, or the SURETY declining to counter-sign any checks or refusing to make any transfers or declining to furnish any BONDS. Without limitation, and as a means of description only, the foregoing includes any alleged failure by the SURETY to mitigate its damages or that the INDEMNITORS are released from their obligations to the SURETY under the SURETY AGREEMENTS by any action or inaction of the SURETY, such as failing to provide financial assistance or accommodation, no longer making ADVANCES, if any, declining to counter-sign any checks, refusing to make any transfers, or declining to furnish any BONDS to the INDEMNITORS. The INDEMNITORS expressly waive the provisions, rights and benefits of any applicable civil code which may provide that a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

## SECTION 7 – CONTRACT FUNDS

7.1    The INDEMNITORS agree that the CONTRACT FUNDS shall be deposited directly into the TRUST ACCOUNT according to the TRUST AGREEMENTS. The disbursement of the CONTRACT FUNDS shall be governed by the TRUST AGREEMENT.

7.2     The CONTRACT FUNDS are hereby irrevocably segregated, earmarked and set aside solely and only for the purposes set forth in this AGREEMENT and the TRUST AGREEMENT.  The proceeds and the CONTRACT FUNDS and all other monies deposited in the TRUST ACCOUNT shall be considered and constituted as trust funds for the purposes set forth in this AGREEMENT and the TRUST AGREEMENT.   The INDEMNITORS hereby covenant and agree that they will not knowingly permit any funds in the TRUST ACCOUNT, whether represented by checks, vouchers, orders or otherwise, to be used for any purpose other than those purposes set forth in this AGREEMENT and the TRUST AGREEMENT.

7.3     The INDEMNITORS and the SURETY have entered into a TRUST AGREEMENT which shall govern the collection, deposit and disbursement of the CONTRACT FUNDS.

## SECTION 8 - REIMBURSEMENT

8.1     The INDEMNITORS shall reimburse and pay to the SURETY the full amount of any and all LOSS including without limitation any and all ADVANCES made by the SURETY upon the earlier of (a) receipt by the INDEMNITORS of a written demand from the SURETY; (b) the occurrence of an EVENT of DEFAULT; or (c) three months from the date of this AGREEMENT.

8.2     Payment of amounts due the SURETY under the SURETY AGREEMENTS are payable upon demand with interest at the rate of eight percent (8.0%) per annum.  Time is of the essence of this AGREEMENT.  *We would like to have a pay off plan over several years with minimum or 0% interest.*

8.3     Until SURETY shall have been furnished with evidence satisfactory to the SURETY of its discharge on all BONDS without LOSS, the SURETY shall have the right at all times during normal business hours (upon reasonable notice) to free access to the INDEMNITORS' books and records including, without limitation, its books, records, accounts, computer software, and other computer-stored information, for the purposes of examining, copying or reproducing the same. The INDEMNITORS authorize and request any and all depositories in which funds of the INDEMNITORS may be deposited to furnish to the SURETY, upon its written request, statements of account and other documents reflecting receipts and disbursements, with any PERSON, doing business with the INDEMNITORS authorized to furnish any information requested by the SURETY concerning any transaction.  The INDEMNITORS further authorize the SURETY'S representatives, including attorneys, accountants, consultants, and employees to visit at any time the job sites and projects described in the BONDED CONTRACTS and to obtain at any time access to all job records and personnel of the INDEMNITORS to determine the status of the INDEMNITORS' progress on the BONDED CONTRACTS, and to obtain at any time any and all other information or documentation deemed necessary at the sole discretion of the SURETY and/or its representatives.

## SECTION 9 – ACCOUNTING AND REPORTING

The INDEMNITORS shall provide to the SURETY accountings and reports as follows:

(a)      The INDEMNITORS will provide the SURETY copies of yearly audited
FINANCIAL STATEMENTS as soon as possible upon completion but in no event later than 120
days after the end of the period under audit. Additionally, the INDEMNITORS will furnish the
SURETY with quarterly FINANCIAL STATEMENTS with complete entries prepared in
conformity with GAAP, applied on a basis consistent with that of the preceding fiscal years and
from year to year. Further, the INDEMNITORS shall maintain accurate books of account
showing clearly, among other things, the itemized receipts and disbursements allocated to the
BONDED CONTRACTS.

(b)      Within ten (10) calendar days of the execution of this AGREEMENT, the
INDEMNITORS will provide the SURETY with a current schedule of ACCOUNTS for each
BONDED and UNBONDED CONTRACT listing the name and address of each Account Debtor
along with a description of the services and/or goods supplied together with an aging analysis;
and

(c)      Within ten (10) calendar days of the execution of this AGREEMENT, the
INDEMNITORS will provide the SURETY with an accounting of all of the INDEMNITORS'
cash, whether held in accounts at banking institutions or otherwise, along with copies of the most
recent bank and other account statements pertaining them; and

(d)      On a weekly basis, the INDEMNITORS shall provide the SURETY proof that
TAXES on all WORK are being timely paid.

(e)      The INDEMNITORS shall provide the SURETY regular written reports including
the status of completion of the BONDED CONTRACTS and work in progress schedules for all
BONDED and UNBONDED CONTRACTS every 60 days. The first report shall be provided 60
days from the date of this AGREEMENT. The INDEMNITORS shall also provide the SURETY
any other reports requested by the SURETY, including but not limited to cash flow analyses and
projections.

## SECTION 10 - COLLATERAL SECURITY

10.1.    As partial security for repayment of the amounts advanced pursuant to Section 5
above and the INDEMNITORS' obligations under the SURETY AGREEMENTS, the
INDEMNITORS grant to the SURETY the following, all of which is collectively referred to as
COLLATERAL:

(a)      All rights the INDEMNITORS possess in and to the CONTRACT FUNDS; and

(b)      A security interest in the assets and rights of the INDEMNITORS in the
UNBONDED CONTRACTS, including, without limitation, all UNBONDED CONTRACTS
described on the attached Exhibit J, and including, without limitation, all contract rights and
rights to the payment of money under any UNBONDED CONTRACTS. The INDEMNITORS
represent and warrant that a complete and accurate list of UNBONDED CONTRACTS is
attached and incorporated into this AGREEMENT as Exhibit J; and

The INDEMNITORS irrevocably grant the SURETY the right to act as their attorney-in-fact to demand receipt of, commence suit, settle, compromise or adjust any and all claims the INDEMNITORS have or may have against any party with respect to the BONDED CONTRACTS as the SURETY in its sole discretion deems appropriate whether or not the INDEMNITORS agree with the SURETY'S decision.

(c)    A security interest in the proceeds of any claim or claims asserted by the INDEMNITORS against the OBLIGEES or owners on any BONDED CONTRACTS and UNBONDED CONTRACTS. The INDEMNITORS represent and warrant that a complete and accurate list of claims identified by bond number (if applicable), the OBLIGEE or owner, project description and amount of claim is incorporated into and made part of this AGREEMENT and is attached as Exhibit C. The INDEMNITORS shall furnish to the SURETY a complete written narrative of each claim and all material documents which substantiate and back up each claim within 30 days of the date of this AGREEMENT; and

(d)    Deeds of Trust or Mortgages on real property as described on Exhibit D and as more particularly described in each Deed of Trust or Mortgage attached thereto. The INDEMNITORS represent and warrant that a complete list of the real property subject to this AGREEMENT and the Deeds of Trust and Mortgages for each are incorporated into and made part of this AGREEMENT and are attached as Group Exhibit D; and

*[handwritten: Af cf cef pledged to bank on line of credit. 1622 B Rosemont was given to Phyllis by her father]*

(e)    An Assignment of All Rents and Leases for Real Property and Equipment. The INDEMNITORS represent and warrant that a complete list of real property and equipment subject to this AGREEMENT and the Assignment of Rents and Leases for Real Property and Equipment are incorporated into and made part of this AGREEMENT and are attached as Group Exhibit E. The INDEMNITORS shall use their "best efforts" to secure re-issued Certificates of Title which will reflect the SURETY as a lien holder; and ~~[redacted]~~

*[redacted handwritten text]* *(Redacted)*

(f)    A security interest in all of INDEMNITORS' vehicles and equipment. The INDEMNITORS represent and warrant that a complete list of vehicles and equipment subject to this AGREEMENT and Certificates of Title for each are incorporated into and made part of this AGREEMENT and are attached as Group Exhibit K; and

(g)    A security interest in all of INDEMNITORS' accounts receivables, personal property, goods, inventory, accounts, chattel paper, documents, instruments, investments, money, GENERAL INTANGIBLES, EQUIPMENT and OTHER COLLATERAL. The INDEMNITORS represent and warrant that a list of the items described in this paragraph and subject to this AGREEMENT (collectively, the "Miscellaneous Collateral") is incorporated into and made part of this AGREEMENT and is attached as Exhibit F.

10.2.    The INDEMNITORS represent that: they are the sole owner(s) of the COLLATERAL; and that the COLLATERAL is not impaired or subject to any encumbrances other than those disclosed in writing to the SURETY. A Schedule of Encumbered Collateral identified by description of each individual encumbered item and the corresponding encumbrance is incorporated into and made part of this AGREEMENT and is attached as Exhibit G. The INDEMNITORS agree to defend, indemnify and hold harmless the SURETY from any claims, demands, liability, loss, costs, expenses or attorneys' fees related to or arising from the

COLLATERAL or its title which are made or presented by any PERSON against the SURETY and/or the COLLATERAL.

     10.3    With regard to each item of the COLLATERAL, the INDEMNITORS covenant:

     (a)    To continue to hold each item of the COLLATERAL free and clear of all liens, security interest, claims or encumbrances except those disclosed in Exhibit G; and

     (b)    To maintain the COLLATERAL in good order and repair except for ordinary wear and tear; and

     (c)    To immediately notify the SURETY in writing of any loss, damage, investigation, action, suit, proceeding or claim related to any item of the COLLATERAL or which may result in any material change to the status of the COLLATERAL; and

     (d)    Not to sell, lease, transfer, assign, abandon or otherwise dispose of any part of the COLLATERAL other than the sale or use of inventory in the ordinary course of business; and

     (e)    To maintain, at the INDEMNITORS' expense, adequate insurance naming the SURETY as the Loss Payee in a form and from an insurer acceptable to the SURETY which shall provide thirty (30) days prior written notice to the SURETY of cancellation or reduction of coverage. The INDEMNITORS must provide the SURETY evidence of such insurance including a copy of any policies with Loss Payee endorsements. If the INDEMNITORS fail to maintain insurance, or to provide the SURETY evidence of insurance, the SURETY may obtain insurance at the INDEMNITORS' expense and may settle any claims and/or amend or cancel such insurance; and

     (f)    To allow the SURETY access to the COLLATERAL for the purpose of inspection ant any reasonable time upon reasonable notice; and

     (g)    To pay all TAXES, fees and similar charges relating to the COLLATERAL or its uses; and

     (h)    Not to form, acquire, consolidate or merge with any other entity unless the other entity and/or the newly created entity agrees in writing to pledge all of it's assets as collateral as described in this AGREEMENT and the SURETY consents to the formation, acquisition, consolidation or merger.

     10.4    The INDEMNITORS may sell any of the COLLATERAL with the consent of the SURETY. The SURETY will not withhold its reasonable consent provided that the sale is for fair market value to a bona fide third party and that the SURETY receives all sale proceeds net of closing costs, real estate commissions and proceeds payable to senior secured liens on the respective COLLATERAL. If the SURETY and the INDEMNITORS cannot agree as to the fair market value of the COLLATERAL, the fair market value shall be determined by a third-party appraiser with an expertise in valuing the same or similar COLLATERAL. The appraiser's cost shall be considered a "LOSS". The SURETY agrees to release its security interests in the event of a sale of the COLLATERAL and agrees to execute appropriate UCC-3 forms and/or other

documents as necessary to effectuate the sale of the COLLATERAL.

10.5    In the event the SURETY determines to liquidate all or any portion of the
COLLATERAL, the SURETY may apply, or hold for application, proceeds from the liquidation
to repay any LOSS, premium due and/or loss, expense or attorneys' fees incurred in connection
with the COLLATERAL, the SURETY AGREEMENTS and sale of any COLLATERAL. The
INDEMNITORS agree to execute all instruments or agreements necessary to carry out the
purposes and intent of the SURETY AGREEMENTS including all those necessary or proper to
perfect the SURETY'S interest in the COLLATERAL and/or to liquidate the COLLATERAL.

10.6    The SURETY may permit the INDEMNITORS to substitute other collateral
acceptable to the SURETY for the COLLATERAL. The terms of this AGREEMENT shall
govern any substituted or additional collateral requested, demanded or deposited.

10.7    The INDEMNITORS acknowledge that the failure of the INDEMNITORS to
deposit, immediately upon demand, any sum subsequently demanded by the SURETY as
collateral security will cause irreparable harm to the SURETY for which the SURETY has no
adequate remedy at law. The INDEMNITORS agree that the SURETY will be entitled to
injunctive relief for specific performance of the obligations of the INDEMNTIORS to deposit
the sum demanded as collateral security and hereby waive any claims or defenses to the contrary.
The rights afforded the SURETY in this Section are in addition to any rights of the SURETY
under the INDEMNITY AGREEMENT. The INDEMNITORS agree that the INDEMNITORS
furnishing the COLLATERAL does not waive the SURETY'S absolute right to demand further
collateral pursuant to this Section.

## SECTION 11 – EVENT OF DEFAULT

Without prejudice to any other rights or remedies of the SURETY, the INDEMNITORS
agree that upon the occurrence of an EVENT OF DEFAULT, the SURETY has, but is not
limited to, the following remedies:

(a)    Any and all obligations and indebtedness of the INDEMNITORS to the SURETY
under the SURETY AGREEMENTS, shall immediately become due and payable at the sole
election of the SURETY and the SURETY may exercise such rights in any COLLATERAL as
the SURETY has under the SURETY AGREEMENTS, or pursuant to any applicable law or
statute; and

(b)    Furthermore, the SURETY shall have and shall be entitled to exercise some or
any or all of its rights and remedies under the SURETY AGREEMENTS, or under any other
agreement or instruments which have been or which may hereafter be executed and delivered to
the SURETY by the INDEMNITORS, as well as any and all other rights and remedies the
SURETY may have under any applicable law or statute, including the SURETY'S common law
surety rights. The INDEMNITORS expressly waive presentment, demand, notice of default,
protest or any other notice; and

(c)    At its sole option, and by any method it selects, the SURETY may withdraw any
balance then on deposit in either the TRUST ACCOUNT or LOCK-BOX ACCOUNT or any

other account of any nature; and

(d) ~~The SURETY is irrevocably authorized and empowered by the INDEMNITORS to acknowledge to any OBLIGEE on any BOND or to any other party that the INDEMNITORS are in default under the BONDED CONTRACTS.~~ In that connection, the INDEMNITORS hereby irrevocably constitute and appoint the SURETY as their true and lawful attorney to execute in their name, place and stead, any and all instruments and to do and perform any and all other acts and things requisite and proper to affect the termination and completion of the BONDED CONTRACTS, including, but not limited to, re-bidding or arranging for the completion of the BONDED CONTRACTS in the name of the INDEMNITORS, or otherwise, with the power to sign all requisitions and releases in the name of any of the INDEMNITORS for any CONTRACT FUNDS of whatsoever kind or nature due under the BONDED CONTRACTS. The INDEMNITORS hereby give and grant to the SURETY full power of attorney and authority to do and perform each and every act and thing whatsoever requisite and necessary to be done to carry out the purposes of this AGREEMENT, as fully as if for all intents and purposes the INDEMNITORS were personally present. The INDEMNITORS hereby ratify and confirm every act that the SURETY as such attorney-in-fact has done or may do in the premises; and

(e) The SURETY may take any and all action that it deems necessary in its sole and absolute discretion, and may exercise its rights and remedies under the various SURETY AGREEMENTS concurrently, consecutively, or separately, and at any time and from time to time, at the SURETY'S sole and absolute discretion.

## SECTION 12 – ADDITIONAL COVENANTS

12.1    The INDEMNITORS shall not enter into any new contracts or undertakings with respect to any new projects not presently existing without the prior written consent or approval of SURETY, which prior written approval will not be unreasonably withheld.

12.2    The INDEMNITORS shall not change in any material way the type or character of their business as of the date of this AGREEMENT, which is as a contractor.

12.3    The INDEMNITORS shall not incur any additional indebtedness of any kind not existing at the time of this AGREEMENT, including but not limited to increased OVERHEAD or purchase of new equipment or other assets, or make any advances or loans to any PERSON, firm or corporation, or become guarantor of the indebtedness of any PERSON, firm or corporation, without the prior written approval of the SURETY. This provision does not limit the INDEMNITORS' purchase of construction materials or supplies purchased in the ordinary course of business.

12.4    The INDEMNITORS shall pay any and shall not increase the compensation of any officer or employee who is related by blood or marriage to any officer or shareholder without the express written consent of the SURETY. The INDEMNITORS shall not pay any funds or assets into any profit sharing or bonus programs with its employees or officers or enter into any new profit sharing, pension or bonus program except as otherwise required by law without the prior written approval of the SURETY.

12.5 The INDEMNITORS agree to use their "best efforts" to complete the BONDED CONTRACTS on a timely basis. The INDEMNITORS agree that as part of their "best efforts" they will not allow any other work of the INDEMNITORS to interfere with the completion of the BONDED CONTRACTS.

12.6 The INDEMNITORS agree to subordinate in favor of the SURETY any rights the INDEMNITORS have among and between each other as a result of any loans, debts, advances, claims or any amounts due and owing between and among each other until the SURETY is paid in full under the terms of the SURETY AGREEMENTS.

12.7 The INDEMNITORS agree that no additional Capital Stock will be issued by the INDEMNITORS and that there will be no changes in the exiting stock ownership of the INDEMNITORS without written consent of the SURETY.

12.8 The INDEMNITORS covenant that there is no suit, action or proceeding filed or known to be imminent against any INDEMNITOR in which there is a possibility of an adverse decision that could materially affect the business, financial position or results of operations of any INDEMNITOR other than those disclosed in writing to the SURETY on the Schedule of Litigation which is incorporated into and made part of this AGREEMENT and is attached as Exhibit I.

## SECTION 13 - EVENT OF BANKRUPTCY

13.1 In the event of a filing by or against any or all of the INDEMNITORS under the BANKRUPTCY CODE, the provisions of this Section will govern the relationship and rights between the parties to this AGREEMENT.

13.2. The INDEMNITORS agree that in the event of a filing by or against the INDEMNITORS of a proceeding under the BANKRUPTCY CODE:

(a) The SURETY is the holder of a "claim" and a claimant within the meaning of §101(5) of the BANKRUPTCY CODE and is a "party in interest" within the meaning of §362(d) and §1109(b) of the BANKRUPTCY CODE. SURETY has standing as a party in interest to be heard in all matters including, without limitation, the right to seek relief pursuant to §361-365 of the BANKRUPTCY CODE.

(b) An EVENT OF DEFAULT will be deemed to continue to exist and will not be deemed to be cured notwithstanding the payment or the advancement of funds by the SURETY for the payment of claims, bills, or other indebtedness incurred in or in connection with the performance of the BONDED CONTRACTS;

(c) Time is of the essence in the INDEMNITORS acceptance or rejection of a BONDED CONTRACT pursuant to §365 of the BANKRUPTCY CODE, and any delay in the PRINCIPAL'S prompt acceptance or rejection of same may materially increase the SURETY'S LOSS; and

(d)     With respect to any BONDED CONTRACT assumed by any of the INDEMNITORS pursuant to §365 of the BANKRUPTCY CODE, the cure of any default and the adequate assurance of future performance to which the SURETY will be entitled will include, but not be limited to : (i) payment by the INDEMNITORS to the SURETY in an amount not less than any RESERVE which the SURETY may be required by statute or otherwise deem necessary to establish with respect to the BONDED CONTRACT so assumed; or (ii) the INDEMNITORS may provide the SURETY with an irrevocable letter of credit, financial guarantee, or surety bond in a form and from a financial or corporate surety reasonably acceptable to the SURETY in an amount not less than any RESERVE which the SURETY may be required by statute or otherwise deem necessary to establish with respect to the BONDED CONTRACT so assumed. The INDEMNITORS represent and agree with the SURETY any COLLATERAL of any nature provided the SURETY pursuant to this AGREEMENT and the SURETY AGREEMENTS is insufficient for purposes of providing adequate assurance of future performance to SURETY with respect to any BONDED CONTRACT so assumed.

13.3     The SURETY and the INDEMNITORS expressly agree that the proceeds arising from the BONDED CONTRACTS constitute "cash collateral" as that term is defined under §363 of the BANKRUPTCY CODE. The SURETY and the INDEMNITORS further agree that the SURETY will have a claim to the proceeds arising from such BONDED CONTRACTS and said claim will have priority over all expenses of the kind specified or ordered pursuant to §105, §326, §330, §331, §303(b), §503(c), §507(a), §507(b), §546(c), or §726 of the BANKRUPTCY CODE, and will also have priority over any other priority claims. The INDEMNITORS further acknowledge that this claim of the SURETY will at all times be senior to the rights of the INDEMNITORS or any trustee in any case or proceeding in which any INDEMNITOR becomes a debtor or debtor-in-possession under the BANKRUPTCY CODE.

13.4     Nothing herein will be deemed to be a consent by the SURETY that any INDEMNITOR use any "cash collateral" within the meaning of §363 of the BANKRUPTCY CODE, including without limitation proceeds from the BONDED CONTRACTS and any funds in the LOCK BOX ACCOUNT, the TRUST ACCOUNT or the PAYROLL ACCOUNT. In the event that a court of competent jurisdiction determines that, notwithstanding the foregoing, the INDEMNITORS may use any such "cash collateral", then the INDEMNITORS stipulate that the "cash collateral" so used will be disbursed first to the payment of the COST TO COMPLETE the BONDED CONTRACTS, but only for the COST TO COMPLETE for which the SURETY is or may become liable under the BONDS, including the payment of bona fide claims for labor and materials incurred in connection with the BONDED CONTRACTS and for which the SURETY is or may become liable under the BONDS; and second, subject to the availability of periodic surplusages of proceeds from the BONDED CONTRACTS, to the payment of OVERHEAD, which is ordinary and necessary, provided, however, a stringent standard will be used when determining what constitutes "ordinary and necessary" OVERHEAD.

13.5     In partial consideration and as new value for this AGREEMENT and the SURETY'S forbearances and in the event that the INDEMNITORS, or any of them, are the subject of any insolvency, bankruptcy, receivership, dissolution, re-organization or similar proceeding under the Federal or State law, voluntary or involuntary then:

(a)     the INDEMNITORS or any of them shall not assert or request any other PERSON

to assert that the automatic stay provisions provided under Title 11 U.S.C. §362 of the BANKRUPTCY CODE shall operate, or be interpreted to operate, to stay, modify, preempt, condition, reduce or limit the ability of the SURETY to enforce any rights it has by virtue of this AGREEMENT, the SURETY AGREEMENTS, or any other agreement or instrument between the SURETY and the INDEMNITORS or any of them, or at law, or in equity , or any other rights the SURETY has now or may hereafter acquire against the INDEMNITORS or any of them or the COLLATERAL; and

  (b) the SURETY shall be entitled to the automatic and absolute lifting of and relief from any automatic stay imposed by Title 11 U.S.C. §362 of the BANKRUPTCY CODE, as amended or otherwise on or against the exercise of the rights and remedies otherwise available to the SURETY; and

  (c) the SURETY shall be entitled, and the INDEMNITORS irrevocably consent, to an order granting relief from any and all stays and equitable relief under Title 11 U.S.C. §105 of the BANKRUPTCY CODE or other applicable law to permit SURETY to foreclose on any COLLATERAL and to exercise any and all other rights and remedies of the SURETY under this AGREEMENT, the SURETY AGREEMENTS and/or any other agreements or instruments between the SURETY and the INDEMNITORS or at law or in equity and the INDEMNITORS irrevocably waive any right to object to such relief.

## SECTION 14 - MISCELLANEOUS

  14.1 Any notice, request, or demand or other communications required, permitted or otherwise contemplated by the SURETY AGREEMENTS shall be in writing and either delivered personally, sent by regularly scheduled overnight air courier service, or postage prepaid certified United States mail, return receipt request, to the following addresses:

To the attention of :
Roxanne Kasten
Traveler' Casualty & Surety Co. of America
111 Schilling Road
Hunt Valley, MD  21031

Austin Frazier
C. E. Frazier Construction Co, Inc.
P.O. Box 2039
Ridgeland, MS  39157

Any such communication will be deemed received at the earliest occurred of: (i) personal receipt; (ii) the date of promised delivery of a regularly scheduled overnight air courier service; or (iii) five (5) days after a deposit in the United States mail. Any of the foregoing addresses may be changed by means of a notice and furnished in the manner provided herein.

  14.2 The INDEMNITORS expressly agree that nothing in this AGREEMENT or the SURETY AGREEMENTS shall in any way forfeit, waive, exonerate, discharge, or impair any rights or remedies of the SURETY (whether legal or equitable), existing now or hereafter, in connection with the BONDS, the BONDED CONTRACTS, or the INDEMNITY

AGREEMENT, all which rights and remedies and the INDEMNITY AGREEMENT, are hereby specifically retained, unaffected, to be effective at the sole option of the SURETY, in the same manner as if this AGREEMENT and the SURETY AGREEMENTS had not been executed. Each and every right, remedy and power hereby granted to the SURETY or allowed the SURETY by law or the INDEMNITY AGREEMENT or the other SURETY AGREEMENTS shall be cumulative and shall not be exclusive of any other right, remedy or power, and may be exercised by the SURETY concurrently, consecutively or separately and at any time and from time to time, in the SURETY'S absolute and sole discretion.

14.3    The INDEMNITORS shall not be deemed an employee or agent of the SURETY by virtue of this AGREEMENT, but shall at all times be, and be deemed to be, independent contractors.

14.4    Time is of the essence of this AGREEMENT and a material consideration.

14.5    This AGREEMENT is a contract under the laws of the State of Mississippi for all purposes including the parties' performance thereof and shall be governed by and construed and enforced in accordance with the laws of such State without regard to its Conflict of Law rules. Unless the jurisdictional prerequisites are not met, the parties hereto irrevocably consent to exclusive jurisdiction of the United States District Court sited in Mississippi, for the purposes of any litigation concerning this AGREEMENT.

14.6    This AGREEMENT will inure to the benefit of, and will be binding upon, the respective successors and permitted assigns of the parties hereto. The INDEMNITORS have no right to assign any of their rights or obligations hereunder without the prior written consent of the SURETY. This AGREEMENT may be amended only by a writing signed on behalf of each party. This AGREEMENT has been negotiated by the parties and each party has had the benefit of counsel. This AGREEMENT shall not be construed against any party. The recitals are incorporated herein and shall be construed as covenants.

14.7    The provisions of this AGREEMENT are intended to be severable. If any provision of this AGREEMENT is held invalid or unenforceable in whole or in part in any jurisdiction, such provision will, as to such jurisdiction, be ineffective only to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this AGREEMENT in any jurisdiction.

14.8    This AGREEMENT may be executed by the parties independently in any number of counterparts, all of which together shall constitute but one and the same instrument which is valid and effective as if all the parties had executed the same counterpart.

14.9    The INDEMNITORS represent and warrant that the execution of this AGREEMENT has been duly authorized by their Board of Directors.

14.10   The Section headings of this AGREEMENT are for convenience only and do not limit, define, or construe the contents of the Sections.

14.11  Along with all documents incorporated herein, this AGREEMENT constitutes the complete expression of the AGREEMENT between the SURETY and the INDEMNITORS. This AGREEMENT is a fully integrated agreement. No prior statements, oral or written, course of dealing or trade usage shall supplement or alter the terms of the SURETY AGREEMENTS. All discussions and prior agreements are merged herein. This AGREEMENT replaces and supersedes any statements or representations the SURETY, its consultants, agents and/or attorneys have made to the INDEMNITORS. No change, addition or amendment shall be made hereto or to any of the terms, covenants or conditions hereof except in writing, signed by the parties hereto. The SURETY does not undertake by this AGREEMENT to protect the credit or reputation of the INDEMNITORS.

14.12  It is further agreed that this AGREEMENT is solely for the benefit of the parties hereto and shall not create any rights in any person not a party hereto, or in any way increase the rights of third persons, or increase the obligations of any party hereto to any third person, or increase the liability of the SURETY under any BONDS.

14.13  The INDEMNITORS HEREBY ACKNOWLEDGE AND AGREE THAT THE SURETY HAS NO OBLIGATION TO FUND THE TRUST ACCOUNT OR PAYROLL ACCOUNT, PROVIDE FINANCIAL ASSISTANCE TO THE INDEMNITORS IN ANY MANNER OR METHOD, OR MAKE ANY PAYMENTS OTHER THAN THOSE PAYMENTS THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT AND THE TRUST AGREEMENT. THE INDEMNITORS SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE INDEMNITORS' EXECUTION OF THIS AGREEMENT AND THE OTHER SURETY AGREEMENTS HAS NOT BEEN INDUCED BY OR MADE IN RELIANCE UPON ANY ORAL OR WRITTEN REPRESENTATIONS BY THE SURETY OR ITS AGENTS, EMPLOYEES, ATTORNEYS OR CONSULTANTS, THAT THE SURETY WILL FUND THE TRUST ACCOUNT OR THE PAYROLL ACCOUNT OR PROVIDE ANY FINANCIAL ASSISTANCE TO THE INDEMNITORS. IF THE SURETY AGREES TO FUND THE TRUST ACCOUNT OR THE PAYROLL ACCOUNT, OR OTHERWISE PROVIDE FINANCIAL ASSISTANCE TO THE INDEMNITORS IN ANY MANNER OR METHOD, OR MAKE ANY PAYMENTS OTHER THAN THOSE PAYMENTS WHICH THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT AND THE TRUST AGREEMENT, THEN THAT ACTION SHALL BE AT THE SOLE JUDGMENT, OPTION AND DISCRETION OF THE SURETY AND IN THE BEST INTERESTS OF THE SURETY AND NOT THE INDEMNITORS. FURTHERMORE, THE SURETY'S AGREEMENT TO TAKE ANY SUCH ACTION DOES NOT BIND AND COMMIT THE SURETY TO ANY OTHER FUNDING OF THE TRUST ACCOUNT OR THE PAYROLL ACCOUNT, PROVIDING FINANCIAL ASSISTANCE, OR THE MAKING OF ANY PAYMENTS OTHER THAN THOSE PAYMENTS THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT OR THE TRUST AGREEMENT.

14.14  TO THE EXTENT PERMITTED BY LAW, EACH PARTY COVENANTS THAT IT WILL NOT ASSERT ANY RIGHT TO TRIAL BY JURY FOR ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT AND/OR ANY THE SURETY AGREEMENTS WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH PARTY ACKNOWLEDGES THAT IT HAS BEEN INFORMED THAT THE PROVISIONS OF THIS SECTION 14.14 CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH THE OTHER PARTIES HAVE RELIED, ARE

RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT. THE PARTIES
MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 14.14 WITH
ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF SUCH OTHER PARTY
TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

## **SECTION 15**

15.    Notwithstanding any other provision of this Agreement, INDEMNITORS agree that SURETY may undertake all action which the SURETY deems necessary and appropriate in its sole and absolute discretion to engage a contractor or replacement contractor to complete or assist in completion of the MSVU, Science and Tech Building Project ("the Science & Tech Project"). To this end, SURETY may communicate directly with the Obligee of the Science & Tech Project, all employees of the INDEMNITORS, all Subcontractors and Suppliers associated with the Science & Tech Project, and any other person or entities as the SURETY deems necessary in its sole and absolute discretion. SURETY may also communicate with any potential contractors or replacement contractors, consultants, attorneys, or other persons regarding any and all aspect of the Science & Tech Project, may disclose and share information regarding the Science & Tech Project, may solicit bids, quotations and proposals from potential completion contractors, consultants or other persons and may take any and all other action when and as the SURETY deems necessary to transfer, assign and/or relet the Science & Tech Project to another contractor, in the SURETY's sole and absolute discretion. INDEMNITORS agree to fully cooperate and assist the SURETY when and as the SURETY requests, and shall provide to the SURETY all information, access to the project site and any other assistance and support that the SURETY may reasonably request to facilitate the assignment, transfer and/or relet of the Science & Tech Project when and as the SURETY may deem appropriate in its sole and absolute discretion.

IN WITNESS WHEREOF, the parties hereto have executed this AGREEMENT on the date and year first above written.

PRINCIPAL:

C. E. FRAZIER CONSTRUCTION COMPANY, INC.

By:    _C E Frazier_

Date:    _12-20-07_

INDEMNITORS:

FRAZIER DEVELOPMENT LLC,

By:    _C Frazier_

Date:    _12-20-07_

M.F. PROPERTIES, LP

By:    _[signature]_

Date:    _12-20-07_

AWF, LLC

By: _____

Date: _____

C.E FRAZIER, JR., INDIVIDUALLY

_____

Date: _____

PHYLLIS E FRAZIER, INDIVIDUALLY

_____

Date: _____

AUSTIN W. FRAZIER, INDIVIDUALLY

_____

Date: _____


CLAIBORNE FRAZIER, INDIVIDUALLY.

_____

Date: _____


SURETY:

TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA

By: _____

Date: _____

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **LIST OF EXHIBITS**

A.    Bonds
B.    Indemnitor Financial Statements
C.    Schedule of Claims
D.    Schedule of Real Property and Deeds of Trust
E.    Schedule and Assignment of Rents and Leases
F.    Schedule of Miscellaneous Collateral
G.    Schedule of Encumbered Collateral
H.    [Intentionally Left Blank]
I.    Schedule of Litigation
J.    List of Unbonded Contracts
L.    Schedule of Vehicles and Equipment and Certificates of Title

## EXHIBIT A

**See Attached List of Bonds**

**EXHIBIT A to TRUST AGREEMENT and
COLLATERAL/REIMBURSEMENT
AGREEMENT**

| Bond Nbr | Obligee | Project Desc | Bond Amt | Eff Date |
|---|---|---|---|---|
| 104451196 | MD Properties, LLC | NATCHEZ REGIONAL MEDICAL CENTER OFFICE BUILDING | 2,613,408 | 2/25/2005 |
| 104539212 | Tupelo Regional Airport | TUPELO REGIONAL AIRPORT | 4,197,461 | 6/25/2005 |
| 104612959 | Madison County School District | WGY #4511-30 Velma Jackson HS | 2,799,599 | 11/28/2005 |
| 104633458 | Bureau of Building, Grounds and Real Property Management | MS Delta Community College, Women's Dorm | 5,518,000 | 1/17/2006 |
| 104679016 | Natchez Regional Medical Center | NATCHEZ REGIONAL MEDICAL CENTER - MOB PARKING LOT AND DRIVES | 565,772 | 2/17/2006 |
| 104700136 | Madison County Board of Supervisors | MADISON COUNTY OFFICE COMPLEX | 5,471,000 | 4/11/2006 |
| 104809999 | Natchez Regional Medical Center | NATCHEZ REGIONAL MEDICAL CENTER - NATCHEZ PODS/NEUROLOGY DOCTOR'S PAVILION | 812,200 | 12/19/2006 |
| 104867912 | BUREAU OF BLDGS GROUNDS & R/P MGMT | GS#106-198, MS VALLEY STATE UNIV | 12,685,700 | 1/24/2007 |
| 104867915 | Natchez Regional Medical Center | MEDICAL OFFICE BLDG | 126,003 | 2/23/2007 |
| SZ1821 | Pearl Public School District | Pearl Lower Elementary School | 7,824,666 | 5/27/2003 |

**PRYOR & FRAZIER BOND**

| Bond Nbr | Obligee | Project Desc | Bond Amt | Eff Date |
|---|---|---|---|---|
| ST9089 | U.S. DEPT. OF AGRICULTURE | National Biological Control Lab, Stoneville, MS | 11,334,000 | 5/31/2002 |

**EXHIBIT B**

**INDEMNITOR FINANCIAL STATEMENTS.**

**See attached financial statements.**

[REDACTED]

**EXHIBIT C**

**SCHEDULE OF CLAIMS**

**See attached schedule.**

**Exhibit C to the TRUST AGREEMENT and COLLATERAL/REIMBURSEMENT AGREEMENT**

| Claim Num | Claimant | Project | Lawsuit | Amt Claimed |
|---|---|---|---|---|
| 111-SC-S0502568-NR | E. Cornell Malone Corp. | Colony Crossing, Madison, MS - | Y | $12,000.00 |
| 111-SC-T070552B-RG | D H Griffin Companies | MVSU Science & Tech Bldg | N | $44,978.00 |
| 111-SC-T0705526-RG | Aguilar Forming | MVSU Science & Tech Bldg | N | $140,731.00 |
| 111-SC-T0705526-RG | Gravel Hill Construction | MVSU Science & Tech Bldg | N | $9,181.25 |
| 111-SC-T0705526-RG | Harrell Metal Works | MVSU Science & Tech Bldg | N | $125,500.00 |
| 111-SC-S0704400-NR | F. L. Crane & Sons, Inc. | TUPELO REGIONAL AIRPORT | N | $197,572.80 |
| 111-SC-S0704400-NR | Precision Machine & Metal | TUPELO REGIONAL AIRPORT | N | $16,422.42 |
| 111-SC-S0704400-NR | Pitts Companies Cabinets and Millwork, Inc. | TUPELO REGIONAL AIRPORT | N | $18,211.50 |
| 111-SC-T0700979-NR | Acoustics, Inc. | Madison Co.Office Complex | N | $86,861.00 |
| 111-SC-T0700979-NR | Independent Roofing Systems, Inc. | Madison Co.Office Complex | N | $75,384.00 |
| 111-SC-T0700979-NR | Commercial Flooring Inc. | Madison Co.Office Complex | N | $103,064.00 |
| 111-SC-T0700979-NR | G M Home, LLC | Madison Co.Office Complex | N | $40,700.00 |
| 111-SC-T0700979-NR | Garrett Construction | Madison Co.Office Complex | N | $115,978.45 |
| 111-SC-T0700979-RG | L. Harris Construction Company | Madison Co.Office Complex | N | $23,940.00 |
| 111-SC-T0700979-RG | McLain Plumbing & Electrical Service, Inc. | Madison Co.Office Complex | N | $101,348.01 |
| 111-SC-T0700979-RG | Twin States Electric | Madison Co.Office Complex | N | $24,225.00 |
| 111-SC-T0701754-NR | Acoustics, Inc. | New Women's Residence Hall | N | $75,931.00 |
| 111-SC-T0701754-NR | Capitol Hardware Company | New Women's Residence Hall | N | $192,467.00 |
| 111-SC-T0701754-NR | Old South Brick | New Women's Residence Hall | N | $36,439.05 |
| 111-SC-T0701754-NR | SOUTH CENTRAL HEATING & PLUMBING | New Women's Residence Hall | N | $548,855.50 |
| 111-SC-T0701754-NR | Tull Brothers, Inc. | New Women's Residence Hall | N | $76,299.10 |
| 111-SC-T0703918-NR | Acoustics, Inc. | Velma Jackson High School Auditorium | N | $16,379.00 |
| 111-SC-T0703918-NR | B & E Communications Inc. | Velma Jackson High School Auditorium | N | $6,141.50 |
| 111-SC-T0703918-NR | Jackson Paint | Velma Jackson High School Auditorium | N | $14,000.00 |
| 111-SC-T0703918-NR | Mississippi Door | Velma Jackson High School Auditorium | N | $20,886.00 |
| 111-SC-ST908901-NR | Live Oak Landscapes | National Biological Control Lab, Stoneville, MS | Y | $120,140.96 |
| 111-SC-ST908901-RG | Asia Construction, Inc. | National Biological Control Lab, Stoneville, MS | Y | $75,000.00 |

CJF Not Bihoi debt the exact amounts I will work with
J.F. Payne to confirm these.

**EXHIBIT D**

<u>**SCHEDULE OF REAL PROPERTY AND DEEDS OF TRUST AND MORTGAGES**</u>

**See attached schedule.**

(REDACTED)

**EXHIBIT E**

**ASSIGNMENT OF RENTS AND LEASES**

See attached schedule.

[REDACTED]

**EXHIBIT F**

**SCHEDULE OF MISCELLANEOUS COLLATERAL**

**See attached schedule.**

(REDACTED)

## EXHIBIT G

## SCHEDULE OF ENCUMBERED COLLATERAL

[REDACTED]

## EXHIBIT H

## [INTENTIONALLY LEFT BLANK]

## EXHIBIT I

### SCHEDULE OF LITIGATION

**None**

## EXHIBIT J

## LIST OF UNBONDED CONTRACTS

**None**

# EXHIBIT K

## SCHEDULE OF VEHICLES AND EQUIPMENT AND
## CERTIFICATES OF TITLE

**All Vehicles and Equipment Owned by the Indemnitors, including any Vehicles and
Equipment referenced in the attached Financial Statements.**